## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

CATHERINE BOHN, as guardian for )
Thomas Cook, )
)
      Plaintiff, )     No. 15 cv 106 EJM
)
vs. )
)     ORDER
CEDAR RAPIDS COMMUNITY )
SCHOOL DISTRICT, et al., )
)
      Defendants.

Before the court are (1) plaintiff's resisted motion for leave to file her initial brief on the merits, (2) defendants' resisted motion to dismiss and request for sanctions, both filed October 4, 2016, and (3) the merits of the case. Motion for leave to file initial brief granted. Motion to dismiss denied. Judgment for defendants on the merits.

This case is an appeal by a guardian for a disabled student, Thomas Cook, under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 et seq., from a decision of an Administrative Law Judge in a special education due process proceeding. This court has jurisdiction under 28 U.S.C. §1331.

Plaintiff's motion for leave to file her initial brief and defendants' motion to dismiss both arise from the same fact. That fact is that plaintiff's counsel, after missing multiple time deadlines and violating multiple court orders as to length of brief, again violated this court's Order filed September 1, 2016, that the merits brief be no more than 50 pages and be filed by no later than October 3, 2016. Plaintiff filed a brief on October 4, 2016, of 53 pages in length. This is clearly a violation of this court's order, and merely the latest in a string of such violations. However, in the interest of justice, and in order to not punish

the client, here a young disabled student, for the sins of the attorney, the court will reluctantly grant the motion for leave to file the offending brief and deny the motion to dismiss, in order to reach the merits. Further provision and remedy for the attorney violations will be discussed later in this opinion.

This case began when Plaintiff filed a due process complaint under the IDEA with the Iowa Department of Education on February 14, 2014. PDF[1] 21, p. 690. Plaintiff alleges numerous procedural and substantive violations of the IDEA relating to most aspects of Thomas's educational program. *See* PDF 21, pp. 690–715. Defendants deny that they violated the procedural or substantive requirements of the IDEA and state that Thomas at all times was provided with a Free Appropriate Public Education (FAPE), as required by the IDEA.

The case was heard by Administrative Law Judge (ALJ) Christie Scase on September 17, 18, 19, 22, and 23, and November 17-21, 2014. *See id.* at 521. Both sides were represented by counsel at the hearing. Numerous educators from the defendants District and the Area Education Agency (AEA) and a large number of witnesses personally familiar with Thomas testified in the course of the ten-day administrative hearing, and Thomas himself. The ALJ received approximately 2600 pages of exhibits into evidence (1750 from the Plaintiff and 850 from the Defendants). *See id.* at 522. Following the close of the hearing, Plaintiff and Defendants submitted extensive post-hearing legal briefs for the ALJ's consideration.

After reviewing the extensive record before her, the ALJ rendered a 54-page decision on July 2, 2015. PDF 21, pp. 520–573. The ALJ concluded that Defendants

---

[1] This Order refers to the Record of the Administrative Proceedings produced by the Iowa Department of Education by the Portable Document Format (PDF) file number assigned by the Department.

"complied with the mandates of the IDEA and provided Thomas Cook with an [ Individual Education Plan (IEP) ] reasonably calculated to allow him to receive some educational benefit. Respondents prevail on all issues and the Complainant is entitled to no relief." PDF 21, p. 573. The ALJ's ruling was based on 31 pages of findings of fact supported by evidence contained in the record from the administrative hearing. On September 29, 2015, Plaintiff appealed the ALJ's decision to this court.

A concise listing of plaintiff's main arguments would be appropriate at this point, but such is extremely difficult in this case, due to the poor presentation of plaintiff's case. As the ALJ noted, correctly in the opinion of this court, "[Plaintiff's] presentation is at times circular and often conclusory, making it extremely difficult to distinguish fact claims from legal argument." ALJ Decision, p. 39. The fact that the record, which is 6,724 pages, largely undigested by plaintiff's counsel, briefs, and statements in this case are so long make that situation worse, not better. That said, plaintiff's three main arguments seem to be:

1. Thomas' IEP team failed to conduct an adequate enough psychological evaluation of Thomas to determine the "root cause" of his performance limitations and so identify his unique needs,

2. The District failed to comply with the IDEA's procedural requirements for post-secondary transition planning, and

3. The District generally failed to provide a sufficient accommodation for Thomas' disability.

The facts of the case are that Thomas Cook was a high school student attending Kennedy High School, a comprehensive high school in the District The ALJ found that "Thomas is consistently described by his teachers as a quiet, polite, and pleasant young man" who "enjoys reading fiction for pleasure" and "working with his hands, especially working on cars." PDF 21, p. 523. The ALJ noted that "Thomas convinced the owner of

3

an auto-shop...to give him a job." Id. The ALJ also found that "Thomas understands the accommodations that he is entitled to receive under his IEP, but sometimes refuses to accept them because he does not think it was fair to other students and does not want people to find out" that he is in special education. Id. She further stated that "Thomas' motivation and performance varies from class to class, based in part upon the pace and difficulty of the course and in part upon his interest in the subject and comfort with the teacher." Id. The ALJ ultimately concluded that "[b]y any reasonable measure, Thomas received not merely some but *substantial* educational benefit from the program provided to him by [Defendants]." Id. at 573.[2]

Plaintiff moved with Thomas to Iowa in 2007. PDF 21, p. 525. Thomas enrolled in the District in the fall of 2008. Id. at 526. Plaintiff requested and received an evaluation of Thomas during the fall of 2008 "to gather further data to determine appropriate strategies to move Thomas toward[] grade level performance." Id. (citing PDF 11, p. 29). In the spring of 2009, Plaintiff requested an Independent Education Evaluation to determine why Thomas was not closing the academic gap with his peers. Id. This evaluation was performed at the University of Iowa Hospitals and Clinics—Center for Disability and Development (UIHC) in March 2009. Id. The ALJ found that the UIHC evaluation confirmed the previous diagnoses of dyslexia, dysgraphia, and ADHD, and reported "*mild* concerns about Thomas's self-monitoring and organization skills," which are components of executive function. See PDF 21, p. 526 (citing PDF 11, pp. 47–48).

---

[2] The ALJ found that Plaintiff, Thomas' mother, "has no formal education or training relating to teaching and spent very little time observing Thomas in the classroom in recent years." Id. at 524. While the ALJ concluded that Plaintiff "wants Thomas to receive the best education available and has been a fierce advocate on his behalf," she also determined that:

> [Plaintiff] appeared to have lost respect for nearly all teachers and administrators at the school. She did not believe district staff was truly trying to do what was right for Thomas. [Plaintiff] was openly hostile during parts of her testimony and expressed, in her words, "an absolute lack of trust for the school."

Id.

4

The ALJ reviewed Thomas's education and evaluation history prior to February 14, 2012, the beginning of the two-year period relevant to the Complaint. *See* PDF 21, p. 524–530. She found that Thomas had been initially evaluated by the Kennedy Krieger Institute in Baltimore, Maryland during second grade. *Id.* at 525. This evaluation found that Thomas was of "generally average…intelligence with specific learning disabilities, particularly in the area of reading." *Id.* (citing PDF 11, p. 6). The evaluation also concluded that Thomas showed signs of "attentional difficulties that will interfere with learning, behavior, and performance at his optimal capability level…compatible with a diagnosis of Attention-Deficit Hyperactivity Disorder (ADHD)." *Id.* (citing PDF 11, p. 7). Following this evaluation, "Thomas was identified as a student eligible for special education and related services and had an… [IEP] in place throughout the remainder of his elementary grades, middle school, and high school." *Id.*

The ALJ found several additional evaluations that were performed by Defendants supported the development of his IEP. These included: classroom observations conducted by an applied behavioral analyst/challenging behavior consultant from Defendant AEA in April 2011; a Functional Behavior Assessment evaluation conducted by Defendants in May 2011; a written language assessment conducted by Defendant AEA in April 2012; an additional independent educational evaluation requested by Defendants to assess Thomas in the areas of reading, writing, and spelling conducted by the UIHC in April 2012; a reevaluation conducted by Defendants pursuant to 34 C.F.R. § 300.303 in May 2012; and a reading assessment conducted by a literacy consultant with Defendant AEA requested by Plaintiff which determined why Thomas had difficulty "keeping up with grade level textbooks." *Id.* at 551, 561–62. The ALJ noted that other consistent sources of information about Thomas's educational performance could be

found in IEP progress monitoring results, grade reports, and results from annual state-wide assessments. *Id.* at 562.

The ALJ noted that the IEP document used by Defendants is part of a unified, state-wide IEP document management system. PDF 21, p. 531 (citing PDF 4, pp. 29–30). The ALJ also noted that this IEP, along with the two subsequent IEPs relevant to this action, constitute "Transition IEPs," which are designed on a standard template to ensure the IEP team considers and addresses the information required by the IDEA to students of transition age.[3] The ALJ explained:

> Because Thomas was over age of 14 when the 2011-2012 IEP was developed, the law required his IEP to address post high school transition. His 2011-2012 IEP was in the format of a transition IEP. The results of transition assessments administered in April of 2011, including a Transition IEP Questionnaire, Independent Living Assessment, and What's your Learning Style Inventory and I Have A Plan entries completed by Thomas, as well as a parent interview. (Compl. 77) Information about Thomas' life skills, current academic progress, career interests, post-secondary expectations, and course requirements needed for Thomas to meet graduation requirements is included in the "Present Levels of Academic Achievement and Functional Performance" section – the "B pages" – of the IEP. No need for IEP goals addressing independent living or work was noted on the IEP. Thomas was unsure what he wanted to do after high school. He indicated several areas of interest, many of which require some post-secondary education. Learning was endorsed as a transition goal area. (Compl. 77-79).

PDF 21, p. 531 & n.7 (noting that Plaintiff stated that she did not want transition assessments conducted in 2011, so the transition information from his 2010–2011 IEP were used and updated through student interview to determine current transition planning.)

---

[3] Federal law requires the IEP that will be in effect when the student turns 16 to address post-high school transition. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). Iowa has chosen to impose this requirement beginning with the IEP in effect when the student turns 14. 281 Iowa Admin. Code § 41.320(2).

The IEP that was in place at the beginning of the limitation period for this action was finalized on September 19, 2011, the fall of Thomas's 9th grade school year. *See* PDF 21, p. 530. The ALJ summarized the contents of Thomas's September 19, 2011 IEP on pp. 11–13 of her decision. *Id.* at 530–32. This IEP contained goals for reading comprehension, writing, and organizational strategies/assignment completion. *Id.* at 531 (citing PDF 17, pp. 85, 90, 95). Thomas received his specially designed instruction in a 1:1 setting with a special education teacher on a daily basis; he received additional specially designed instruction in reading and writing in a co-taught language arts class that provided support for pre-reading strategies, outlines for reading and written work, and summarizing. *Id.* at 531–32 (citing PDF 17, p. 102). Thomas also received a list of accommodations applicable to all general education classes, which included reading support (e.g., adults reading tests and materials aloud, alternate materials where appropriate), word processing or oral responses, communication with Plaintiff regarding assignment completion, chunking of large projects, summarizing or "front-loading" concepts to be covered in each class, positive verbal prompts, and review of the IEP by all teachers per parent request. *Id.* at 532 (citing PDF 17, p. 101). Thomas received assistive technology support, including audiobooks, recorded text, and the use of a District-issued iPad. PDF 21, p. 532.

The ALJ summarized Thomas's performance in 9th grade under the September 19, 2011 IEP. PDF 21, pp. 534–37. Thomas received good grades in his general education classes—primarily A's and B's, with a cumulative GPA of 3.092 on a 4-point scale. PDF 17, p.63. Thomas scored at the 55th percentile on the reading portion and at the 41st percentile on the math portion of the Iowa Test of Basic Skills administered in April 2012—making him proficient in both areas. *Id.* at 77–78. The ALJ found that

7

"Thomas made progress on each of his goals and his reading, writing, and homework completion skills improved during 9th grade." PDF 21, p. 534.

Prior to the development of his 10th grade IEP, Defendants conducted a periodic reevaluation as required by the IDEA. PDF 21, p. 537. This evaluation included a review of existing information as well as an additional written language assessment performed by the AEA and an evaluation conducted by the UIHC in the areas of reading, writing, and spelling. *Id.* at pp. 537–39. These evaluations characterized Thomas's reading and writing abilities as "within the range typically found among students receiving instruction in general education classes." *Id.* at p. 539.

The ALJ summarized Thomas's performance in 10th grade, finding that Thomas passed all of his classes except AP European History and finished the school year with a 2.111 GPA. *Id.* She also noted that Thomas "made some progress on his reading and writing skills during 10th grade." *Id.* While Thomas was meeting his IEP goal earlier in the year with respect to assignment completion, he dropped from 85% to 77% assignment completion in core academic classes during spring term, though his IEP noted that he also had an above average number of absences from school during this time. *Id.* at 546 (citing PDF 17, p. 220). Thomas's Iowa Assessment scores demonstrate continued growth and strong performance: he scored at the 60th percentile in reading and the 71st percentile in mathematics on this nationally-normed standardized assessment, meaning that he was proficient in both subject areas. PDF 17, p. 75.

Thomas's IEP for 11th grade was developed over the course of two meetings in April and May 2013. Plaintiff was represented by counsel at both meetings. PDF 21, p. 546. Prior to the meeting, Thomas and his mother completed transition planning assessments; Thomas's IEP noted that "Thomas would benefit from support in the area

8

of career decision-making and employment" as he progressed in his high school career. See id. at 547 (citing PDF 17, p. 215). Defendants invited Holly Mateer, a representative from the Iowa Division of Vocational Rehabilitation Services (DVRS) to both IEP meetings. Id. Plaintiff and her attorney had an opportunity to question Mateer about the services that could be available to Thomas. Id. However, Plaintiff refused to apply for DVRS services. Id.

With respect to Thomas's performance in 11th grade, the ALJ found that although Thomas had "inconsistent" performance in his IEP goal areas, he maintained passing grades in all classes except Algebra II, and finished the year with a 2.59 GPA, which was an improvement over the previous year. See id. at 551. He also achieved a 57th percentile in reading and a 44th percentile in math total on the Iowa Assessments, putting him again in the proficient range on both subjects. Id.

Plaintiff has the burden of proof in this proceeding as she did in the due process proceeding below. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 51 (2005); E.S. v. Indep. Sch. Dist. No. 196, 135 F.3d 566, 569 (8th Cir.1998) (citations omitted).

Under the IDEA, school districts are required to provide a FAPE to disabled students who require special education services. 20 U.S.C. § 1412(a)(1)(A). The United States Supreme Court has held that the determination of whether FAPE has been met is a two-fold inquiry: (1) whether the school district complied with the procedures noted in the IDEA and (2) whether the IEP is developed through the Act's procedures reasonably calculated to enable the student to receive educational benefits. Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206–07 (1982).

Under the IDEA, a district court must review the state administrative record, hear additional evidence if requested, and, "basing its decision on the preponderance of the

9

evidence, grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). When reviewing whether a student has been provided with a FAPE, this Court should "evaluate the IEP as a whole, rather than scrutinizing the component parts in isolation." *See* M.Z. v. New York City. Dept. of Educ., No. 12 civ-4111, 2013 WL 1314992, at * (S.D.N.Y. Mar. 21, 2013) (citing Karl ex rel. Karl v. Bd. of Educ., 736 F.2d 873, 887 (2d Cir. 1984)).

Plaintiff attacks both the qualifications of the ALJ and the findings of fact and conclusions of law set forth in her 54-page decision. Plaintiff points out, without further explanation, the ALJ "trained as a lawyer," but "has no training as an educator." Docket no. 35-1, p.28. However, the ALJ's background is not remotely relevant to the amount of weight or deference due to her findings under the IDEA. The minimum requirements for an IDEA hearing officer are set forth in 34 C.F.R. § 300.511(c), and do not distinguish between hearing officers whose background is in the law as opposed to educational practice. An ALJ is required to "possess knowledge of, and the ability to understand, the provisions of the IDEA, "possess the knowledge and ability to conduct hearings in accordance with appropriate standard legal practice," and to "possess the knowledge and ability to render and write decisions in accordance with appropriate standard legal practice." Based on the ALJ's qualifications, prior experience, and the thoroughness of the decision, it is clear that the ALJ possessed the required knowledge and ability to hear the case and render a decision; Plaintiff has not met her burden of proving otherwise.

Plaintiff contends that Defendants failed to properly evaluate Thomas, and therefore, could not have developed an appropriate IEP for him. *See* Docket no. 35–1, pp. 37–41. Under the IDEA, an "[e]valuation means procedures used in accordance with

10

§§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." 34 C.F.R. § 300.15. Evaluations must involve a review of existing evaluation data on the child, including evaluations and information provided by the child's parents, current classroom-based, local, or state assessments, classroom- based observations, and observations by teachers and related services providers. 20 U.S.C. §1414(c)(1)(A). On the basis of that review, the public agencies, with input from the child's parent, must determine whether any additional information is required to answer the following questions:

- Is the child is a child with a disability under the IDEA?
- What are the educational needs of the child?
- What are the present levels of academic achievement and related developmental needs of the child?
- Does the child need (or continue to need) special education and related services?
- Are any additions or modifications to the special education and related services need to enable the child to meet the measurable annual goals set out in the child's IEP and to participate, as appropriate, in the general education curriculum?

20 U.S.C. § 1414(c)(1)(B). There is no requirement that the evaluation team evaluate for the purpose of identifying the "root cause" of a child's disability. See id. Defendants were required to perform evaluations which complied with § 1414(c)(1), and they did so.

The ALJ's decision thoroughly summarizes the numerous evaluations that were contained in Thomas's education records maintained by Defendants and utilized in developing his various IEPs. See PDF 21, pp. 561–62 (Kennedy Krieger Institute evaluation conducted in 2004; Defendant AEA reading assessment in 2007; evaluation of Thomas by Defendant AEA in 2008; Independent Education Evaluation paid for by Defendant AEA in 2009; Functional Behavior Assessment evaluation conducted by Defendants in 2011; written language assessment conducted by Defendant AEA in April

2012; educational evaluation requested by Defendants to assess Thomas in the areas of reading, writing, and spelling; reevaluation conducted by Defendants pursuant to 34 C.F.R. § 300.303 in May 2012). At the time Plaintiff filed her due process complaint in February 2014, the most recent reevaluation was less than two years old, and Defendants were clearly in compliance with the timeframe for reevaluation set forth in 34 C.F.R. § 300.303. The ALJ noted on page 32 of her decision that, after the initiation of the due process complaint, Defendants conducted an additional evaluation of Thomas's reading skills, at Plaintiff's request, in May 2014. *See* PDF 21, p. 551.

Defendants adequately evaluated Thomas and determined his disability-related educational needs. 20 U.S.C. § 1414(c)(1)(B). The ALJ noted that "Thomas' IEP team had *ample* assessment results and evaluations to fulfill the IDEA reevaluation requirement. No further assessment concerning executive function skill deficits was required or justified." PDF 21, p. 565.

With respect to Plaintiff's claim that Thomas should have been evaluated to determine whether he needed a math goal in his IEP, the ALJ noted that Thomas consistently performed at or above grade level on standardized assessments and received passing grades in 9th and 10th grade math. PDF 21, p. 563. While Thomas failed first trimester of Algebra II in 11th grade, Thomas attributed his difficulty in this class to reading the problems—meaning that the specially designed instruction required to support Thomas would have been in the area of reading, not math. *See* PDF 21, p. 563. Defendants also note that Plaintiff and Thomas were advised *against* enrolling Thomas in Algebra II by Kennedy staff; it was recommended instead that he take a class covering the same content at a slower pace. *See* PDF 3, pp. 245–46, PDF 9, pp. 7, 14–15, 25– 26; PDF 18, p. 283. This recommendation was disregarded by Plaintiff, and Thomas was

enrolled in Algebra II. PDF 9, p. 80. Indeed, the only two classes that Thomas failed at Kennedy were classes in which Plaintiff enrolled Thomas against the guidance of Kennedy staff. *See id.*; *see also* PDF 21, p. 543–44. With respect to mathematics, the ALJ found that "no further assessment in the area of math skills was required [by the IDEA] or justified." PDF 21, p. 563.

Each of these evaluations contain descriptions of Thomas's disability-related needs, and were the foundation for the development his IEPs. Because the evaluations are part of the IEP itself, Thomas's IEP teams had more than sufficient information at their disposal when developing his IEPs.

Defendants provided Thomas with a FAPE. As noted in Section III.A, *supra*, the seminal case for determining the substantive standard to which public agencies will be held under the IDEA is the Supreme Court's decision in Rowley. *See* 458 U.S. 176. In Rowley, the Court concluded that "the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. The IDEA does not require public schools to provide the "best" possible program for any child, nor are they required to "maximize the potential" of a child. *Id.* at 189.

In interpreting Rowley with regard to the level of education necessary to provide a FAPE, the Eighth Circuit has adopted the "some educational benefit standard." *See* Sneitzer v. Iowa Dep't of Educ., 796 F.3d 942, 950 (8th Cir. 2015); M.M. v. District 0001 Lancaster County Sch., 702 F.3d 479, 485 (8th Cir. 2012); K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 809 (8th Cir. 2011); Lathrop R-II Sch. Dist. v. Gray, 611 F.3d 419, 427 (8th Cir. 2010); M.M. v. Special Sch. Dist. No. 1, 512 F.3d 455, 461 (8th Cir. 2008); Bradley v. Ark. Dept. of Educ., 443 F.3d 965, 975 (8th Cir. 2006); CJN v.

13

Minneapolis Pub. Sch., 323 F. 3d 630, 642–43 (8th Cir. 2003); Neosho R-V Sch. Dist. v. Clark, 315 F.3d. 1022, 1027 (8th Cir. 2003); Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1035 (8th Cir. 2000); Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir. 1999). However, see Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004); Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 808–09 (5th Cir. 2003); Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182 (3d Cir. 1988). Further, courts should look to the IEP as a whole rather than scrutinizing its component parts, as Plaintiff asks this Court to do, when determining whether FAPE has been provided. See M.Z., 2013 WL 1314992 at *9 (citing Karl, 736 F.2d at 887).

Despite Plaintiff's claims to the contrary, Rowley remains the supreme law of the land and was not negated by subsequent congressional amendments to the IDEA. See O.S. v. Fairfax County Sch. Bd., 804 F.3d 354 (4th Cir. 2015). As the Fourth Circuit stated in O.S.:

> [Congress]'s shift from requiring access to requiring results does not necessarily establish a shift in the meaning of FAPE from providing "some" benefit to providing "meaningful" benefit. When Congress changes the law on an issue already decided by the Supreme Court, it typically does so explicitly.... Congress did not do that with respect to the definition of FAPE.
>
> Rather than articulate a new definition of FAPE, Congress amended the IDEA in other ways [e.g., requiring documentation of academic achievement and functional performance rather than educational performance]....

O.S., 804 F.3d at 358–59. The O.S. court also noted that using the term "meaningful," as the Court did in Rowley, is "simply another way to characterize the requirement that an IEP must provide a child with more than minimal, trivial progress." Id. at 359. Plaintiff's attempt to cast the Eighth Circuit's use of the term "meaningful" as conferring a heightened substantive standard of FAPE than was plainly intended by Rowley is

14

erroneous and inconsistent with the extensive Eighth Circuit precedent on this matter. *See* K.E., 647 F.3d at 809 ("To provide a child with a 'free appropriate public education,' a school district must give her 'access to specialized instruction and related services' that are 'individually designed' to provide "some educational benefit." (citing Rowley)).

The Eighth Circuit has thoroughly explained what it means by "some educational benefit." In Ft. Zumwalt Sch. Dist. v. Clynes, the plaintiffs alleged that their son required a special school placement and sought reimbursement for the private education program they obtained for him. 119 F.3d 607, 609 (8th Cir. 1997). The Eighth Circuit rejected plaintiff's request for reimbursement, holding that the school had offered a FAPE. *Id.* at 614–15. The court stated that the "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense. The statute only requires that a public school provide sufficient specialized services so that the student benefits from his education." *Id.* at 612 (citations omitted).

In Blackmon, the Eighth Circuit stated:

> Although the IDEA mandates individualized "appropriate" education for disabled children, it does not require a school district to provide a child with the specific educational placement that her parents prefer.... The IDEA's requirements thus are satisfied when a school district provides individualized education and services sufficient to provide disabled children with "some educational benefit."

*Id.* at 658 (citations omitted).

In CJN, the Eighth Circuit explained that:

> [W]e have recognized that "[a]s long as a student is benefiting from his education, it is up to the educators to determine the appropriate educational methodology." *Fort Zumwalt*, 119 F.3d at 614. Specific results are not required, 34 C.F.R. § 300.350(b), and an IEP need not be designed to maximize a student's potential "commensurate with the opportunity provided to other children," *see Rowley*, 458 U.S. at 189–198, 102 S. Ct. 3034. Thus, even assuming *arguendo* that more positive behavior interventions could have been employed, that fact is largely irrelevant. The

record reveals that the District made a "good faith effort" to assist CJN in achieving his educational goals. *See* 34 C.F.R. § 300.350(a)(2).... [O]ne can reasonably conclude from this record that more did not appear necessary at the time to help him progress behaviorally.

323 F.3d at 638–39. The CJN decision is especially relevant to this case, as a significant portion of Plaintiff's arguments relate to her belief that the methodologies and instructional materials used by Defendants were inappropriate or could have been better. *See* Docket no. 35-1, pp. 46–47 (attacking veteran special education teachers' decisions to use Monterrey Reading, Read 180, and Advanced Skills for School Success). However, other than Plaintiff's subjective beliefs that these highly qualified and experienced teachers could not know what they were doing because they lacked sufficient information about Thomas's needs—a wholly untrue contention, *see supra*—she provides no actual evidence to support her claims that Thomas did not benefit from his instruction. This Court cannot substitute Plaintiff's subjective beliefs for the opinions and decisions of the trained educators serving Thomas with respect to methodology. *See* CJN, 323 F.3d at 638–39 (quoting Clynes, 119 F.3d at 614).

Furthermore, the CJN court explained that academic progress plays a significant role in determining whether a student's educational program provides the student with a FAPE:

[A]cademic progress is an "important factor" among others in ascertaining whether the student's IEP was reasonably calculated to provide educational benefit. *Rowley,* 458 U.S. at 202, 102 S. Ct. 3034. We believe, as the district court did, that the student's IEP must be responsive to the student's specific disabilities, whether academic or behavioral.

Academic and behavioral matters, however, are not always independent of each other. As we noted in *A.C.,* 258 F.3d at 776–77, "social and emotional problems are not *ipso facto* separable from the learning process." Where, as here, the record indicates that a student's behavioral problems, if unattended, might significantly curtail his ability to learn, the fact that he is learning is significant evidence that his behavioral problems have, at least

in part, been attended to. Of course, we wish that CJN had made more behavioral progress, but the IDEA does not require that schools attempt to maximize a child's potential, or, as a matter of fact, guarantee that the student actually make any progress at all. It requires only that the student be provided with an IEP that is reasonably calculated to provide educational benefit and we conclude that that happened here.

CJN, 323 F.3d at 642. Although *de minimis* academic progress may not support a finding that FAPE has been provided, *see* Clark, 315 F.3d at 1027–29, such a case of minimal progress "is in stark contrast to the circumstances in the instant case where there is undisputed evidence that CJN is progressing academically at an average rate, thus indicating, at the very least, that his behavior problems are being sufficiently controlled for him to receive some educational benefit." CJN, 323 F.3d at 642–43. Similarly, to the extent that Thomas's executive functioning deficits—which were characterized as "mild" by the UIHC evaluators (PDF 21, p. 526)— impacted his educational performance, it is clear he made much better than *de minimis* academic progress, as Thomas earned virtually all passing grades while taking a challenging class schedule, advanced from grade to grade with his peers, and earned average or better-than- average scores on standardized tests. *Id.* At 573; *see also* 17, pp. 63, 72–78.

Although Plaintiff claims that the IEPs must fail because she does not believe they identified Thomas's unique educational needs, the ALJ found that Thomas's IEPs contained "an accurate basic description of Thomas's disabilities and how they limit his progress" as well as "a listing of Thomas' diagnoses, a general description of past services, and data regarding his current level of academic performance," as well as "reports of all prior assessments and evaluations [which] are appended to his IEP as associated files." PDF 21, p. 567. There is no requirement in the IDEA that an IEP must include as a heading the words "unique needs." *See* PDF 21, pp. 565–66 (citing 34 C.F.R.

300.320(a), 281 Iowa Admin. Code § 41.320). Thomas's unique needs are summarized and referenced on the B page of his IEPs, and further incorporated into the IEP through the evaluations that are associated with the IEP. *See* PDF 17, pp. 216–17 ("Areas identified as needing extra support were recognizing, revising, and producing sentences that are more consistently syntactically correct, spelling errors, subject verb agreement, and key word omission. ... he exhibits attentional difficulties that interfere with learning, behavior and performance at his optimal level" ... "Due to reduced reading and writing fluency relative to peers, classes with high demands in these areas may be challenging for Thomas."); *see also* PDF 2, pp. 247–48.

Plaintiff also challenges each and every IEP goal for all three IEPs in place within the two-year statute of limitations. *See* Docket no. 35–1, pp. 41–46. However, the ALJ, after a careful review of the three IEPs in place during the two-year statute of limitations and Plaintiff's challenges thereto, found that:

> The goal statements, progress monitoring measures, and accommodations were not completely flawless.... The goals could have more narrowly targeted sub-skill deficits and the progress monitoring methods could have been more precise. The accommodations could have been more clearly defined. However, I conclude that the goals, progress monitoring measures, and accommodations in these IEPs were *more than adequate to provide Thomas with a [FAPE].*

PDF 21, p. 568 (emphasis added). Citing numerous cases, including *CJN*, 323 F.3d at 638, the ALJ observed that merely showing that an IEP "could have been better does not establish a denial of FAPE." PDF 21, p. 568. As the *CJN* court stated, "even assuming *arguendo* that more [supports] could have been employed, that fact is largely irrelevant. The record reveals that the District made a 'good faith effort' to assist CJN in achieving his educational goals." *CJN*, 323 F.3d at 642. Defendants were not required to provide Thomas with an "optimal experience." *See* Sneitzer, 796 F.3d at 948.

18

Plaintiff alleges that Defendants recycled IEPs from one year to the next. *See* Docket no. 35–1, p. 52 (citing <u>Damarcus S. v. D.C.</u>, no. cv-15-851, 2016 WL 2993158, at * 10 (D.D.C. May 23, 2016)). Not only is this inconsistent with the record, *see* PDF 21, pp. 540–41, 547–48, it is also a misstatement of the requirements of the IDEA. The IDEA does not require that an IEP be substantially revised every year; it simply requires that the IEP be reviewed periodically (at least annually) and "revise[d]...*as appropriate* to address" lack of expected progress, new information about the child or the child's anticipated needs, or other matters. *See* 20 U.S.C. §14141(d)(4)(A) (emphasis added). Thomas's IEPs were reviewed annually, and changes were made where the IEP team found revisions to be appropriate. *See* PDF 21, pp. 540–41, 547–48.

All of Thomas's special education teachers testified at length about the efforts they made to match instructional strategies and materials to Thomas's needs and preferences; for example, when Thomas refused to participate in the evidence-based Read 180 instruction, his special education teacher pulled materials from several sources to provide Thomas with reading and writing instruction to meet his disability-related needs. *See* PDF 21, p. 542 (citing PDF 6, pp. 182–84, 208–09). The instruction provided to Thomas was a combination of instructional strategies and methodologies selected by his highly qualified and experienced teachers and informal coaching and modeling. *See* PDF 21, pp. 533, 541–43, 549–50. This is the antithesis of a "one-size-fits-all" approach.

The record contains ample evidence that Thomas was making adequate progress in academics and his IEP goals during the time period relevant to the complaint. This is dispositive of the FAPE inquiry. *See, e.g., M.M. v,* 702 F.3d at 486–88 (noting that where a student receives passing grades and advances from grade to grade with peers, there is strong evidence that FAPE has been provided, especially where the student spends

much of the day in the general education setting); <u>Kasenia R. v. Brookline Sch. Comm.</u>, 588 F. Supp. 2d 175, 192 (D.N.H. 2008) (holding that a student's performance within the average range on standardized test scores is evidence that FAPE has been provided); <u>W.C. v. Cobb County Sch. Dist.</u>, 407 F. Supp. 2d 1351, 1361 (N.D. Ga. 2005) (stating that even where the student's primary goal is related to behavior or some other non-academic manifestation of the disability, academic progress demonstrated by passing grades and standardized test scores remains a "significant factor" in determining whether that student has received a FAPE). Defendants note that Plaintiff's own witness, Dr. Jasper, stated unequivocally that, after conducting a review of Thomas's IEPs, he found those IEPs to be "appropriate given his cognitive deficit profile." *See* PDF 11, p. 83. Plaintiff argues that "[l]ogic does not support inferring the evaluations were sufficient because they led to appropriate recommendations." Docket no. 35–1, p. 33. Yes, in a world of limited resources, human and financial, and in a field as difficult as educating disabled students, it does.

Defendants provided Thomas with adequate transition planning services. In Iowa, IDEA-eligible children must be provided with "transition services" beginning at age 14. 281 Iowa Admin. Code r. 41.320(2). "Transition services" include measurable postsecondary goals, based upon age-appropriate transition assessments related to training, education, and employment, and the courses of study needed to assist the child in reaching those goals. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); 34 CFR § 300.320(b). Defendants, and other public schools in Iowa, use a standardized "transition IEP" form to prompt IEP teams to meet the IDEA's transition requirement. PDF 21, p. 531. "Correctly completing the [transition IEP] form requires the IEP team to address required elements of transition assessments." *Id.* Thomas was provided a transition IEP at all times relevant

20

to the above-captioned action. *Id.* Thomas's IEPs contained the "coordinated set of activities" that were "designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities...." 34 CFR §300.43(a); *see* PDF 21, p. 531.

Defendants are not required or allowed to tell a disabled student what that child can or cannot achieve. There is also no requirement that public agencies separate transition services from other goals and services provided to the child. While transition services may be specially designed instruction tied to a goal, not every child requires special education to receive transition services. *See Letter to Hamilton,* 23 IDELR 721 (OSEP 1995).

> Instruction is one of the vehicles for providing transition services. 34 CFR § 300.18(b)(2)(i). If this instruction is "specially designed" to meet the unique needs of an individual student, it would be considered "special education." This determination would have to be made on a case-by-case basis by the participants responsible for developing the individualized education program (IEP) for the student.

Letter to Hamilton, 23 IDELR 721 (OSEP 1995). Some children are able to receive transition services without "special education," and can participate with general education peers to receive services available to all children. There is no IDEA requirement that transition services must be delivered in a vacuum or separate from other children or from other lessons. *See* Letter to Hamilton, 23 IDELR 721 (OSEP 1995). So long as the transition services are provided as a coordinated set of activities, there is nothing in the IDEA prohibiting Defendants from offering transition services to a student like Thomas along with general education peers, or with special education peers, so long as the services, as determined by the student's strengths, preferences, and interests, can be

delivered to the child with his or her peers. Thomas was provided instruction in transition skills in a class with 10–15 other students and three licensed special education teachers. PDF 21, p. 541. Some of the lessons also overlapped with other skills in Thomas's IEP, including organization and self-advocacy. *See id.* There is no prohibition on transition services being provided in coordination, or even simultaneously, with other IEP services.

Defendants adequately investigated Thomas's needs in the area of transition services by administering a variety of transition planning assessments. *Id.* at 540. Each of Thomas's IEPs during the relevant period of this action contained a review of Thomas's progress toward graduation and course requirements. *Id.* Many of Thomas's post-secondary plans required additional education, thus "learning" was a targeted activity directed at preparing Thomas for life following high school. *See id.* Defendants met their IDEA obligations with respect to transition services.

Ultimately, the <u>Rowley</u> standard extends to transition services as well as other IDEA services. The standardized IEP form provided by the State of Iowa and used for Thomas at all times relevant to this complaint included "all necessary elements of a transition IEP." *Id.* at 570. Thomas's IEP team conducted transition assessments, and based on the data from those assessments, determined that Thomas's IEP goals in the areas of reading, writing, and organizational skills were adequate as transition goals. *Id.* "The specially designed instruction Thomas was receiving in this IEP goal areas and his courses of study were, by definition transition services." *Id.* (citing 281 Iowa Admin. Code § 41.320(2) (b). Additional transition services, which were generally available to all students, were also provided by Defendants. *Id.*; *see also id.* at 356–61.

22

The IDEA is meant to create opportunities for disabled children, not to guarantee a specific result. *See* Rowley, 458 U.S. at 192. Defendants substantially complied with the procedural requirement to address transition. *See* PDF 21, p. 570. Defendants complied with the procedural requirements of the IDEA. "To satisfy the procedural requirements of the IDEA, a 'school district must follow the procedures set forth in the [statute] to formulate an IEP tailored to meet the disabled child's unique needs.'" *K.E.*, 647 F.3d at 804 (quoting Renollett, 440 F.3d at 1011). Defendants followed the IDEA's procedural requirements in the development of all of the IEPs in question. All IEPs were developed through properly-constituted meetings; Plaintiff was provided notice and an opportunity to attend each meeting, and actually attended each meeting; Plaintiff had the opportunity to share her concerns about Thomas's educational program during each meeting; her comments were incorporated into the IEPs, and her suggestions where appropriate were incorporated as well. PDF 21, p. 572. Plaintiff admits that she had the opportunity to attend and participate in meetings, but essentially claims that the team did not address all issues to her satisfaction. Docket no. 35–1, p. 51.

The ALJ quoted the Eighth Circuit's decision in M.M. to demonstrate that Defendants had complied with their procedural obligations with respect to Plaintiff:

> The IDEA requires that the parents of a child with a disability either be "present at each IEP meeting or [be] afforded the opportunity to participate." *Gray*, 611 F.3d at 427 (citation omitted). A school district cannot refuse to consider parents' concerns when drafting an IEP. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). The IDEA explicitly requires school districts to include the parents in the team that drafts the IEP, to consider "the concerns of the parents for enhancing the education of their child," and to address "information about the child provided to, or by, the parents." 20 U.S.C. §1414(d)(3)(A)(ii), (d)(4)(A)(ii)(III).

PDF 21, p. 572 (citing M.M., 702 F.3d at 488). The ALJ concluded "[w]ithout question, [Plaintiff] was given a meaningful opportunity to participate in the creation of each of Thomas' IEPs." PDF 21, p. 572.

In sum, plaintiff's legal theory is mainly to claim that Thomas' IEP team failed to conduct adequate evaluations to determine the root cause of his performance discrepancies and identify his unique needs. She points to areas where defendants' performance could have been better, with more resources, and is therefore less than perfect. This is not enough to make out a claim under the IDEA. Bd. Of Ed. v. Rowley, 458 U.S. 176 (1982); Sch. Bd. v. Renollett, 440 F.3d 1007, 1010 (8th Cir. 2006.) Plaintiff must show that defendants failed to provide Thomas with "some educational benefit" towards a Free Appropriate Public Education, and this plaintiff has not done. The court agrees with the ALJ's thorough report and finds that "the goals, progress monitoring measures, and accommodations in [Thomas'] IEPs were more than adequate to provide Thomas with a free appropriate public education," p. 49 of ALJ report. "Thomas received not merely some but substantial educational benefit from the program provided to him by the Cedar Rapids school district." Id., p. 54.

Regarding the performance of plaintiff's lawyer, and defendant's request for sanctions, as stated, this court has denied the motion to dismiss in order to reach the merits. However, the egregious conduct of plaintiff's lawyer cannot go un-remedied. Plaintiff's initial brief on the merits was due May 17, 2016, extended by plaintiff's own request. It was ultimately filed October 4, 2016, after five extensions of time, yet was still late, and over length, as was the reply brief. Plaintiff's lawyer filed a 6,724 page administrative record, which, as the ALJ noted, was "circular and often conclusory...difficult to distinguish facts claims from legal arguments," p. 39. Plaintiff's

lawyer originally asked to file a 199 page brief on the merits, was ordered to file no more than 50 pages, and filed 53, late. On October 17, 2016, doc. 38-1, plaintiff's lawyer filed an extraordinary statement that he suffered from mental disability, which affected his ability to meet deadlines and practice, apologized, and promised to start using a calendar. As he said, "My clients cannot bear the risk of a repetition of what has happened." His next act in this case, his reply brief, was also late and over-length. Substantively, the attorney compiled a massive 6,724 page record, but never properly digested that record into a cogent legal theory that would merit relief under existing law. His competence to practice law has been drawn into question by the ALJ, by the Magistrate Judge, by this court, and by his own words.

It is therefore

ORDERED

Motion for leave to file initial brief granted. Motion to dismiss denied. Judgment for defendants on the merits. The clerk shall send a copy of this Order and the pertinent documents in this case to the Iowa Supreme Court Attorney Disciplinary Board for its review of plaintiff's attorney's performance in this case.

November 18, 2016

Edward J. McManus, Judge
UNITED STATES DISTRICT COURT